UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:11-CV-386-H

MICHAEL E. FLINN                                                              PLAINTIFF

v.

R.M.D. CORP. and NEAL HARDING                                    DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This suit arises from Michael Flinn's failed acquisition of Defendant Neal Harding's interest in RMD Corporation ("RMD"), which owned and operated multiple Hooters restaurants across four states. This Court previously ruled that Flinn could not enforce an alleged agreement due to of Kentucky's Statute of Frauds. Nevertheless, the Court allowed Flinn to amend his complaint to allege quantum meruit, unjust enrichment, equitable estoppel, and fraud. The Court now finds that Flinn subsequently waived all his claims other than those for fraud. He did so by writing in his response to Defendants' summary judgment motion that he "elects to respond [only] to Defendants' arguments about his fraud claim, because this case is at its core a serious fraud claim for which quantum meruit, equitable estoppel and unjust enrichment provide insufficient redress." The Court finds it hard to imagine a more clear way to waive claims short of using the term "waive."

Defendants have now moved for summary judgment on the remaining claim of fraud. The record contains some three years of interactions and business dealings among the parties. To be sure, the parties had obvious disagreements and misunderstandings. But those

disagreements fall far short of suggesting fraud. For the reasons that follow, the Court concludes that Flinn's fraud claim cannot succeed.

I.

The most important facts are these.

Flinn was the General Partner and 70% owner of South Pacific Partners, a company that owned franchise rights for Hooters in Australia and New Zealand and hoped to acquire RMD's assets. In mid-2008, during ongoing negotiations for this purchase, Flinn began serving as RMD's unofficial president and, by all accounts, was doing a commendable job. In December 2008, during the worst financial climate since the Great Depression, negotiations for the purchase ended when financing could not be arranged.[1] At that point, Flinn individually began negotiations to purchase Neal Harding's interest in RMD.[2]

Over the weekend of December 13-14, 2008, Harding and Flinn met to discuss the potential deal. Flinn claims that the parties reached a full verbal agreement on a three-year option purchase agreement (hereinafter termed the "Option Agreement") containing the following terms:

   a. Flinn would have a three-year option to purchase RMD for a price of $45,000,000.00, with the option period running from January 1, 2009 through December 31, 2011;
   b. Flinn would serve as the president of RMD and would earn a $300,000 annual salary, which sum would be retroactive to Flinn's initial informal service as president;
   c. Flinn would receive 20% of RMD's pre-tax earnings while acting as president during the three-year option period; the remaining 80% of

---

[1] This failed transaction is called the "GE/Sun Trust" transaction in summary judgment briefing. The GE/Sun Trust transaction contemplated a performance-based purchase price and was to be accomplished through third-party financing. Had the deal gone through, SPP would have owned 40 Hooters franchises in four states. Between the first and last letters of intent between the parties, the price dropped from ~$105,000,000 to ~$90,000,000.

[2] On December 12, 2008, Mike Gregory, General Counsel for RMD, informed RMD's higher level employees that "[A]lthough we would like to have been able to complete the sale with [Flinn's company], we are pleased that Neal Harding and Mike Flinn are working on an agreement that will enable Mike Flinn to own RMD, and to assume the day-to-day management authority and responsibility for the business."

2

> RMD's pre-tax earnings were to be paid to Harding and applied toward the $45,000,000 purchase price of RMD; and
>
> d. The attorney's fees and expenses Flinn incurred in the failed GE/Sun Trust Transaction would be reimbursed.

In exchange for these terms,[3] Flinn would help guarantee some of RMD's debt and serve as its President. Flinn alleges Harding wanted him to have "skin in the game" by "step[ping] up" and guaranteeing "probably up to 20 percent" of RMD's refinancing with First Federal Savings Bank ("FFSB"). Flinn says that the purchase price covered not just Harding's equity stake in RMD but also the underlying real estate free and clear of debt. He says that interest was "never" discussed at the weekend meeting. The parties never reduced the Option Agreement to writing and never signed a similar document.

Harding's recollection of the discussions is quite different. He says that Flinn agreed to continue serving as President and begin receiving a $300,000 yearly salary, but his service term was not necessarily delineated by any option period. Harding represented that he would accept $45-50 million for his interest in RMD if Flinn could make a $10 million down payment. In return, Harding would finance the remainder of the purchase price over five years, "with 80% of the total cash available for distribution being applied to Flinn's loan with Harding, and, after the full payment of [a specified rate of] interest [to Harding/RMD], Flinn [would] keep[] the remaining 20% of the total cash available for distribution to pay for Flinn's tax liability he would . . . incur[] by virtue of his ownership of Harding's interest in RMD." Harding is adamant he and Flinn never reached a final agreement in December 2008. Moreover, the deal was never

---

[3] Flinn did not include the personal guarantees he eventually entered as an item in the list of terms the parties allegedly agreed upon in either of his two amended complaints. DN 32-1 ¶ 10, ¶ 29; DN 53 ¶ 10. He added it to the list for the first time in summary judgment briefing: "e. In exchange, and purportedly so that Flinn would "*have skin in the game*," Flinn guarantees 20% of RMD's debt that was on an accelerated payout schedule and in need of immediate refinancing due to the economic downturn." DN 125, p.4 (emphasis in original).

3

completed because "Flinn was never able to raise the $10 million down payment." The evidence supports this conclusion and, in any event, falls well short of suggesting fraud.

After the weekend meeting, Harding asked Mike Gregory, RMD's General Counsel, to document the major points of the parties' discussion. Flinn later contacted Gregory to discuss it. Defendants produced Gregory's planner pages for December 15, 2008 which described the terms. The notes are inconclusive.[4] Regardless, Gregory did not prepare a draft agreement until sometime in January, 2009.

Flinn began acting as RMD's official President on January 1, 2009, and was paid retroactively to his start date in mid-2008. According to Flinn, between the weekend meeting and the closing of the first tranche of FFSB loans, he "pressed" Gregory and Harding to get a memorandum of understanding ("MOU") finalized. Flinn alleges

> Harding told me that he would get the Option Agreement finalized and signed. Harding also told me not to distract Gregory from finishing his work on the FFSB refinancing by asking him to work on the MOU . . . He told me not to worry about getting [it] in writing because Gregory had all of the information he needed to write it up. He told me that if the refinancing did not get finished, Chase could call in its notes, leaving nothing for me to buy. Harding told me the Option Agreement would be put in writing and signed promptly after RMD's debt was refinanced.

Despite the lack of a signed Option Agreement, on January 9, 2009, Flinn and his wife personally guaranteed the first tranche of loans in RMD's debt refinancing. Flinn learned for the first time at closing that he was expected to guarantee not 20% but roughly 70% of RMD's debt.[5] Flinn originally explained that, notwithstanding this new information, he guaranteed the first tranche anyway because he "knew RMD had enough real estate assets to justify taking on more

---

[4] Flinn denies that the terms on the pages Gregory produced are the terms he transcribed. Flinn says Gregory was writing in his planner as the two spoke but "[t]he notes of that conversation, if they still exist, have not been produced." DN 125, p. 43. Presumably, then, Gregory wrote these planner notes during a discussion with Harding.
[5] This amounted to roughly $10 million for the first six loans refinanced on January 9, 2009, and $14 million in total after the last tranche closed in June 2009.

4

risk early in his purchase of RMD. Appraisals showed that the company real property assets exceeded the debt."[6]

A week later, Gregory sent Flinn a draft MOU. Gregory circulated four MOUs in total, the last one on February 15, 2009[7] but the parties signed none of them. Each version contains a section labeled "Memo Purpose":

> This Memo outlines the essential provisions of the OPA;[8] Neal and Mike will follow this Memo with a full agreement containing the OPA essentials defined below, with details further defined and with the terms and conditions ordinary to such agreements. Neal and Mike acknowledge that, having agreed upon the essential terms of employment and installment purchase, it is in RMD's and the Entities' best interests that Neal and Mike move forward with Mike's employment and assumption of authority and responsibility for RMD's and the Entities' operation. Neal and Mike agree to negotiate the remaining OPA details in good faith, taking into account the tax and cash flow ramifications to each other, and their joint purpose of engaging in a practical and workable agreement.[9]

The terms in each draft MOU differ markedly from Flinn's account of the Option Agreement. For instance, even the first draft contemplates a seller-financed installment purchase and adds to

---

[6] In his Response to Defendants' motion for summary judgment, Flinn's explanation changed:

> Flinn justifiably relied . . . the day he guaranteed the first tranche loans, despite Defendants' delay in formalizing the Option Agreement in writing because:
> . . .
> 4. Flinn worried [about] raising [the issue of] the 70% guarantee (when he first saw it) in the first tranche closing, because in the existing unprecedented economic environment, he feared stopping the closing might lead the bank to decide not to loan RMD the money; he feared that might subject [him] to a breach of contract claim by Harding based on the Option Agreement; and
> [5.] Flinn believed that Harding could not on one hand demand Flinn's performance of his Option Agreement obligations (guaranteeing the loans and performing dutifully as RMD's president), and then refuse to perform Defendants' obligations under the same agreement.

[7] Gregory sent Flinn a draft MOU on January 16, January 27, and February 12, 2009. Further notations were made on the draft sent to Flinn on February 12; Gregory labeled this newly notated MOU "V.3" and sent it to Flinn's transactional attorney, Art Berner, on February 15, 2009. Flinn's brief claims there were five MOUs in total, but he includes in that number two documents this Opinion refers to as "LOIs" (circulated on September 22 and October 12, 2009, respectively) and does not consider the February 12 and February 15 documents to be separate versions of the MOU.

[8] "OPA" is defined in the MOU's "Background" section: "Being unable to consummate the asset purchase as originally planned, and having developed a comfortable working relationship[,] Neal and Mike have reached an agreement under which Mike will purchase all of Neal's ownership in RMD and the Entities (the 'OPA')." DEx. 102 (found at DN 101-6).

[9] DEx. 102 (found at DN 101-6).

the $45 million price tag an as-yet undetermined amount "representing [Flinn's] share of expenses of the failed asset purchase paid by RMD or Neal on [Flinn's] behalf."[10] Flinn downplays these differences. He says that he "would have preferred to draft the Option Agreement with the terms agreed in the December 2008 Weekend Meeting, but the MOU drafts correctly stated that he and Harding had agreed to the 'essential terms' of their deal and were required to 'negotiate the remaining [option] details in good faith' . . . ."

By month's end, after circulating two "stabs at" the MOU, Gregory put Flinn on further notice that Harding might adjust the terms. He said that he and Harding and Harper (RMD's Controller) had reviewed RMD's financial situation: "We'll see how that compares to the purchase price as it stands; it may need adjusting, and Neal will determine, with [Harper's] help, what he thinks is fair." On March 25, 2009, after the last draft MOU was circulated, Flinn's transactional attorney Art Berner emailed Harding's transactional attorney Tom Ice to inquire whether he was working on a definitive agreement. Ice answered, "Not until the loan with First Federal is completed." At this point, it seems pretty clear that the parties knowingly had not reached any sort of purchase agreement.

Meanwhile, counsel for Hooters of America ("HOA") began reaching out to Gregory to describe its "two primary concerns" with the proposed transaction:

> First, we asked Mike Flinn's attorneys, repeatedly and for several months, to provide us with the terms of your proposed transaction with Mike. They did not provide us with the terms . . . [Gregory] apparently drafted the bulled-point description; however, he reported to our attorney that you would not let him send it. As a result, at this point, we simply do not know the actual terms of your proposed transaction with Mike Flinn.

---

[10] This term was calculated to be $744,821 by the second MOU circulated on January 27, 2009, an amount "representing Mike's share of expenses of the failed [GE/Sun Trust transaction] paid by RMD or Neal on Mike's behalf." Gregory wrote in a track changes comment connected to this figure, "We still need the amounts advanced by RMD for various permitting, etc. during the sale process." DEx. 105 (found at DN 135-1).

6

> Second, we have concerns about Mike Flinn. We are not going to disclose the business issues that have suddenly arisen between HOA and Mike, unless Mike authorizes us to do so. However, these issues, at this point, lead us to believe that we may be unable to approve Mike as a transferee of your equity in RMD.

Counsel then reminds Harding "any transfer of [Harding's] rights and obligations under [the franchise agreements at issue], including transfers of equity, requires HOA's consent." Harding admits he received this letter on April 22, 2009. Nevertheless, on April 24, 2009, Flinn personally guaranteed four loans in the second tranche of loan refinancing with FFSB.[11]

On May 4, 2009, Harding responded to HOA:

> I am aware of the communication between [HOA's lawyer] and Mike Gregory over the past several weeks concerning my proposed agreement with Mike Flinn. . . . For the reasons I described to you when we talked, that agreement has neither been completed nor reduced to writing. Since you expressed in your April 16th letter that HOA has concerns about Mike Flinn, I have decided not to move forward with any agreement with him until you advise me that those concerns are resolved.

Consequently, Harding inserted a right of first refusal for HOA in the next draft agreement,[12] a term which would have assuaged HOA's concerns about the Flinn deal. Flinn did not object to this term.

The third and final tranche of loans closed on June 30, 2009. No MOUs were circulated between the second and third tranche closings. Flinn explains that he personally guaranteed this last tranche because "he had seen some significant revisions to the [last] draft MOU that contained points from the Option Agreement, such as the 20/80 sharing of distributions, as well

---

[11] Six loans were slated to close on this date, but FFSB noticed declines in the value of real estate serving as collateral on two of the loans and deferred closing on those until later.

[12] The September 2009 Letters of Intent are discussed in more detail later in this section.

7

as other terms that would protect Flinn if Harding found a buyer willing to pay a higher price for his interest in RMD."[13] However, the parties never executed any of these draft MOUs.

In August 2009, Flinn entered into a Forbearance Agreement with two SPP investors to delay suit on defaulted notes. In pertinent part, Flinn promised the investors a portion of his distribution proceeds:

> (1) Flinn is currently negotiating with Neal Harding . . . the terms of an [Option Agreement] pursuant to which Harding would grant Flinn an option . . . to purchase Harding's equity interests in the entities that own the Restaurants . . . and the right to receive 20% of the yearly profits distributed to Harding from the Harding entities after Harding has received $2,250,000[14] per year of such profits;
> (2) [N]either Flinn nor Harding has any obligation to enter into the Option Agreement; and
> (3) [I]t shall be Flinn's sole determination in his discretion of whether and when the Option shall be exercised and how he shall finance any such exercise.

In September 2009, Gregory began circulating drafts of a Letter of Intent ("LOI"). He sent two emails to Flinn with drafts attached labeled "Purchase Option Letter 9-8-09," one on September 22 and again with new track changes comments and revisions on October 12. The terms in these drafts are markedly different from those in the Option Agreement. For instance, the LOIs contained a performance-based purchase price rather than a fixed price of $45 million. Further, another provision required that Harding receive at least $2,250,000[15] in distributions at the end of each year as a condition of the option period continuing for another year. Defendants also included another provision that required HOA's approval for the proposed sale. The parties did not sign either draft LOI.

---

[13] The 20/80 allocation of distribution proceeds, also a feature of the alleged Option Agreement, was included in the in the last, unsigned MOU that Gregory circulated on February 15, 2009, with the caveat that accrued interest (5% on $45 million) be paid before any distributions. *See* DEx. 218 (found at DN 129-3).
[14] This figure represents 5% annual interest on the $45 million portion of the purchase price. This amount of interest was envisioned in all drafts MOUs. The later Letters of Intent list this amount not as interest on a seller-financed loan, but a minimum amount of distributions Harding was to receive each year as a condition of the option remaining open another year.
[15] See note 17 *supra*.

In spring of 2010, Flinn drafted a "Term Sheet" incorporating the terms that "Harding had tried to impose" in the fall 2009 LOIs. He intended this for potential investors who would finance the down-payment on the purchase. Flinn's term sheet called for: (1) his purchase of Harding's ownership interest in RMD; (2) a term ending December 31, 2011; (3) a price of 5.5 times EBITDA; (4) $8 million cash at closing in addition to [Harding's] cash on hand and inventory value of net payables; and (5) a seller note for the difference, financed over 7 years at an 8% interest rate with no prepayment penalty. Although Flinn included the disclaimer "This Term Sheet represents only the current thinking of the parties with respect to certain of the major issues . . . and does not constitute a legally binding agreement," his proposal provides helpful insight into his understanding of the existing situation.

Eventually, on April 13, 2010, the parties did sign a Letter of Acknowledgment that allowed Harding sixty (60) days to obtain financing to purchase RMD (the "LOA"). The LOA contains the following pertinent provisions:

> I understand and agree that your acknowledgment confers no rights to me other than the right to present this letter to potential sources for the funding I would need to obtain in order to make a viable offer to you. I understand that you need to see evidence from me which satisfies you that I have obtained that funding, before we move forward. *Although you and I have discussed in theory various conditions, business structures, allocation of RMD resources, and other items that may pertain in a sale/purchase of your ownership by me, there is no agreement between us regarding the sale/purchase of your Ownership at this time.* All details of the sale/purchase would necessarily be addressed in a purchase agreement.
> …
> I also understand that before we can enter into a Purchase and Sales Agreement, Hooters of America, Inc. must approve me as a purchaser of your Ownership, and also has a right of first refusal that it may exercise, or must waive before I could move forward with purchasing your ownership.[16]
>
> …

---

[16] DN 101-14 (emphasis added).

> With your acknowledgement of these basic terms, I will work for the next 60 days to present you satisfactory evidence that I have obtained the necessary funding. I understand that your acknowledgement does not extend beyond that time, and that you may receive and accept an offer from another party prior to the expiration of the 60 days . . . If I have not been able to present to you satisfactory evidence of funding within [60 days], we can discuss whether you are willing to extend, and what the next steps will be.

Sixty days passed and Flinn could not acquire the necessary financing.

Flinn claims that Harding then proposed a "modification" to the Option Agreement. If Flinn agreed to resign as president, Harding would:

> honor the Option Agreement terms requiring Harding/RMD to: (1) pay Flinn the 20% of cash available for distribution to Harding over the option period; (2) pay Flinn's legal fees and expenses incurred in attempting to close the GE/Sun Trust Transaction; and (3) honor Flinn's option to purchase Harding's interest [in] RMD for $45 million.

According to Flinn, Harding also represented

> Flinn would . . . have a first right of refusal to purchase RMD in the event Harding received an offer from a third party . . . Flinn [would have] the right to close on his $45 million option price within 45 days. And, if Flinn could not or chose not to close at that price, he would receive the positive difference, if any, between the purchase price paid by the third party and Flinn's option price . . . Finally, Harding represented that he would extinguish Flinn's personal guarantees of RMD's debt, saying he knew people who would be willing to take Flinn's place.

Flinn refers to this alleged verbal agreement as the "Modified Option Agreement." According to Flinn, Harding wanted him out of the way so he could sell his interest in RMD to a third party.

Flinn did step down in June of 2010. RMD paid his salary through July 2010. At this juncture, Flinn had known and worked with Harding for over two and a half years. He claims he "believed…in his heart, Harding—as an honest man—knew he was obligated to honor his agreement with Flinn after having induced Flinn to perform on the Option Agreement by both guaranteeing the FFSB loans and serving as RMD's President."

In the summer of 2011, Flinn says he found out through phone calls with his attorney Art Berner and Robert Hersch, one of South Pacific Partners' advisors in the failed GE/Sun Trust transaction, that a sale of RMD to Hooters was "imminent." On July 4, 2011, Flinn filed suit alleging breach of contract. After dismissal of that complaint; an amended complaint and extensive discovery followed; and, finally, this motion.

II.

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). On those issues for which it shoulders the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254 (6th Cir. 1986) (emphasis and citation omitted). For those issues on which the moving party will not have the burden of proof at trial, the movant must "point[ ] out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

A "clear and convincing evidence" standard applies to Flinn's fraud claim. This is a jury-centric standard and courts are to determine whether a reasonable fact finder could find that this standard has been met. *Liberty Lobby*, 477 U.S. at 251-252, 254-255. That is, "[W]e must determine whether the evidence is fit to induce conviction in the minds of reasonable persons under this elevated, relatively stringent evidentiary standard." *Miller's Bottled Gas v. Borg-Warner Corp.*, 955 F.2d 1043, 1050 (6th Cir. 1992) (collecting cases). Courts should be mindful that "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255.

### III.

Flinn's remaining claim lies in fraud. Under Kentucky law, "the party claiming harm must establish six elements . . . by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or recklessly made d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *Dodd v. Dyke Industries*, 2008 WL 1884081, *8 (W.D. Ky. 2008) (Heyburn, J.) (quoting *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)); *see also Harlow v. Beverly Health & Rehab. Servs. Inc.*, 2010 WL 4669189 (Ky. App. 2010); *Miller's Bottled Gas*, 995 F.2d at 1041. Where

the proven facts or circumstances merely show inferences, conjecture, or suspicion, the evidence fails to establish fraud. *Goerter v. Shapiro*, 72 S.W.2d 444, 445-46 (Ky. 1934).

Flinn's allegations center around two sets of circumstances: (1) Harding's representations starting in December 2008 that he would sign the Option Agreement and (2) Harding's representations in the summer of 2010 to induce Harding to resign as RMD's president. The Court will discuss how the elements of fraud apply to each set of representations, then discuss a failure of proof that applies to both sets of representations.

A.

With regard to the initial Option Agreement discussions, Flinn is unable to prove with clear and convincing evidence that (1) any of Defendants' representations were false, (2) that Defendants knew them to be false and/or made them recklessly (3) to induce Flinn to keep pursuing the deal (elements two, three, and four of fraud). Despite exhaustive discovery, nothing in the record suggests that Harding did not fully intend to enter some sort of agreement to sell his interest in RMD to Harding.

For example, very shortly after meeting with Flinn on December 13-14, Harding asked Gregory to record the terms of their discussion. On January 1, 2009, Harding instated Flinn as RMD's president, as promised. Shortly thereafter, he asked Gregory to prepare a first draft MOU. None of the MOUs contained the precise terms that Flinn says were discussed in December 2008. Moreover, Harding did not hide his belief that the parties had yet to reach any specific enforceable agreement in December: from the first draft MOU forward, the "Memo Purpose" section stated that the MOU would be "followed by a full written agreement containing the [Option Purchase Agreement] essentials." Also, each draft MOU contained a provision

reserving Harding's right (albeit in an unenforceable, non-binding MOU) to consult his accountant and attorney regarding the structure of any final agreement.

The MOUs recite the understanding that the parties would "negotiate the remaining OPA details in good faith, taking into account the tax and cash flow ramifications to each other, and their joint purpose of engaging in a practicable and workable agreement." Over the greater part of 2009, the parties did, in fact, continue their efforts to draft an MOU or LOI to capture the parties' evolving discussions. Harding and his agents expended significant time and expense in the process. This sustained effort suggests that Harding was committed to reaching an agreement with Flinn.

Moreover, Flinn cannot prove element five, action in reliance, with clear and convincing evidence. "A plaintiff's reliance, of course, must be reasonable . . . or, as the *Restatement* [*Second of Torts* § 537 (1977)] says, 'justifiable.'" *Flegles, Inc. v. TruServe Corp.*, 289 S.W.3d 544, 549 (Ky. 2009); 27 Williston on Contracts, § 69:33 (4th ed.). Flinn asserts that the terms of the MOUs started changing significantly only after Flinn guaranteed all three tranches of RMD's debt. However, Harding's actions should have put Flinn on notice that the Option Agreement was never set-in-stone, even prior to Flinn's signing the *first* personal guarantee. For instance, Flinn acknowledges that Harding approached him "shortly after" the weekend meeting to float a seller-financed installment purchase structure. Also, Harding asked Flinn to guarantee not 20% but 70% of RMD's debt. All of these events suggests that the parties had not committed to a specific agreement, but were continuing to negotiate.

The Option Agreement and the MOU drafts contained different material terms. Rather than protest the missing terms, (such as the specific 80/20 split of RMD's pre-tax earnings or the provision whereby RMD would repay Flinn for expenses and fees Flinn incurred over the course

of the GE/Sun Trust transaction), Flinn suggested new terms of his own.[17] For example, in the draft MOU circulated on January 27, 2009, a comment entered by Gregory notes "[Flinn] would like an automatic extension right in the event Neal is unable to have [him] removed as a guarantor on any of the debt, regardless of whether [he] has met the other performance criteria that would allow him to extend [the option period]." Another comment reads

> [Flinn] would like a risk mitigation provision that covers the situation where Neal receives a bona fide offer to purchase his position (including management control) and [Flinn] can't match it, then [Flinn] gets an amount equal to 1 times actual equity [he] has paid to Neal, with a floor of $3 million. In addition, if the price Neal chooses to accept is more than the Purchase Price, Neal and [Flinn] split the amount beyond the Purchase Price 80% to Neal, 20% to [Flinn].

Flinn also apparently asked for clarification on how and when he would pay interest, a term he claims was never discussed at the weekend meeting.

Taken together, Flinn's conduct shows that he understood that the Option Agreement was open for negotiation. In any event, Flinn continued serving as RMD's president and the parties continued to work toward an agreement into the fall and winter of 2009, a service for which he was paid an adequate salary. Subsequent events demonstrate that Flinn could not have continued in that capacity based on any assumptions about the enforceability of the Option Agreement.

B.

Flinn also cannot prove justifiable reliance upon what he calls the Modified Option Agreement, much less with clear and convincing evidence.

---

[17] By the time Gregory circulated the document "Neal_Mike Flinn Memorandum of Understanding V3" on February 15, 2009, the "Payment Terms" section provided that "Neal and Mike agree to a benchmark of 80% of . . . available cash to be paid to Neal and applied toward the remaining Purchase Price, and 20% to be paid to Mike." However, the very next sentence stated "Neal and Mike understand and agree that the benchmark percentages may need to be adjusted in conjunction with advice from their respective accountants to maintain compliance with tax laws and regulations applicable to the installment sale." DEx 218.

15

Flinn and Harding entered into the LOA in April 2010. Though the LOA expired without Flinn's raising the capital necessary to close the deal on its stated terms, it remains useful to the Court's analysis because it (and the circumstances leading to it) illustrates the state of the parties' ongoing relationship and the state of the deal when Flinn resigned in June 2010.

By the spring of 2010, Flinn knew Harding was "shopping" his interest in the RMD entities to other potential buyers.[18] When Flinn found out that Harding had given Wings Over North America a term sheet for financing purposes, Flinn proposed his own which called for very different terms than the Option Agreement. For instance, his term sheet called for a performance-based purchase price, $8 million cash at closing, the remaining price to be financed by a seller's note amortized over 7 years with 8% interest and no prepayment penalty. Flinn's term sheet also listed an option period running through December 31, 2011, reflecting his understanding that the parties were still working out the details for a three-year option purchase agreement. Flinn now says that he was merely seeking the same terms Anderson received. This argument makes no sense if Flinn sincerely believed he and Harding had already reached a full agreement.

Harding never signed Flinn's term sheet. Instead, the parties signed the LOA which gave Flinn *60 days* to "present [Harding] satisfactory evidence that [Flinn] ha[d] obtained the necessary funding." Flinn understood that Harding's acknowledgement would not extend beyond that time and that Harding could accept an offer from a third-party prior to that date. If the 60 days passed and Flinn had not obtained satisfactory evidence of funding, the LOA provided "we can discuss whether you [Harding] are willing to extend, and what the next steps

---

[18] This was not in contradiction to any term in Flinn and Harding's draft agreements; the drafts never contained a "no shop" clause. In fact, both of the (unsigned) draft LOIs detailed specific provisions whereby Flinn would be protected with a right of first refusal in a third-party purchase situation, showing that the parties had anticipated and planned for the third-party sale contingency.

16

will be." The financing never materialized and Flinn left RMD in June. As an experienced businessman with counsel, Flinn's decision to step down without a signed document memorializing the consideration for doing so is somewhat inexplicable.

Flinn continued to pursue financing after he resigned and moved back to Texas. After Flinn's resignation, Harding was still planning on sitting in on meetings Flinn had with potential investors.[19] This suggests that even post-resignation, Flinn hoped to close on the purchase of Harding's interest in the RMD entities, and Harding was not closed to the idea if Flinn could raise necessary financing. It does not, however, help Flinn prove that he was induced to step down as RMD's president by the terms of a specific "Modified Option Agreement."[20] Even if Harding made representations about a Modified Option Agreement, which Flinn has not proved, Flinn was not justified in relying on those statements.

C.

An overarching reason why Flinn's fraud claim must fail is his inability to connect the alleged fraudulent misrepresentations to any injury.[21] First, even accepting that Flinn's personal guarantees were extended in consideration for holding an offer open for a three-year option period and that Flinn would not have acted as President of RMD for the salary alone, Flinn failed

---

[19] See DN 125-19, Ex. 12. Mike Gregory emailed Flinn on Friday, June 18, 2010, informing Flinn that he'd told Harding Flinn was going to be "back on Tuesday, with hopefully a conference call or meeting set for Wednesday with the McMahan Group, and that you have a meeting with a GE Capital on Thursday that was initiated by GE Capital. [Harding] is interested in sitting in on both the Wednesday and Thursday functions."

[20] The Modified Option Agreement was that Harding would still "honor" the Option Agreement by (1) paying Flinn 20% of available cash distributions over the option period; (2) paying Flinn's legal fees and expenses incurred in attempting to close the GE/Sun Trust Transaction; and (3) holding open Flinn's option to purchase Harding's interest RMD for $45,000,000 through December 2011. See DN 53, ¶18. The "modifications" were terms whereby Harding/RMD would extinguish the Flinn's' guarantees and provide Flinn the right to close on his $45 million option price within 45 days of an offer from a third party, but if Flinn could not or chose not to close at that price, Flinn would receive the positive difference, if any, of the purchase price paid by the third party and Flinn's option price. DN 125, p. 80.

[21] Of course, Flinn claims he is owed attorney's fees and 20% of RMD's pre-tax earnings, but Flinn is not entitled to these amounts for the reason discussed in Section III.B: Flinn cannot prove he justifiably relied (element 5) on Defendants' representations when he stepped down from the Presidency on the promised terms of a Modified Option Agreement, assuming, as we must on summary judgment, that Defendants even made representations about any such agreement.

to extend an offer within the time allowed under either the Option Agreement or the so-called Modified Option Agreement. Flinn filed suit for breach of contract in July 2011, seven months *before* the option period he now alleges he was relying on was slated to close. Flinn explains that he did so because he had heard a sale of Harding's interest to Hooters was "imminent"—but this is a contingency he claims was covered by a Modified Option Agreement.[22]

Second, Flinn devotes extensive discussion to the benefits Defendants reaped from Flinn's willingness to personally guarantee RMD's refinanced loans. To be sure, Defendants seem to have benefitted from Flinn's providing the personal guarantees. However, these benefits are immaterial for purposes of fraud. Even if Flinn could prove all of the other elements of fraud, and prove that he entered the guarantees believing he was "upholding his end" of the deal, Flinn cannot show Defendants' failure to obtain the full release of the Finns' guarantees until March 7, 2013 caused them any injury. Flinn has testified that neither he nor his wife was damaged in any way by the guarantees. The loans never went into default; the Flinns never paid amounts under them; and Flinn does not claim his ability to raise capital was inhibited by their existence.

Finally, Flinn claims that he is owed attorney's fees and 20% of RMD's pre-tax earnings for the option period. Although these injuries are connected to the fraudulent misrepresentations Flinn alleges, Flinn is not entitled to these amounts for the reasons discussed at length in Section III.B. True, these terms were either contained in or reiterated in the Modified Option Agreement. Yet Flinn was not justified in relying on Defendants' representations as to the

---

[22] This just goes to show that Flinn was not actually relying on the existence of an oral Modified Option Agreement (element five), which is a necessary predicate of showing a nexus between reliance and resultant injury. If Flinn were actually relying on the existence of a Modified Option Agreement, one would *not* expect to see him file suit in July 2011, before even trying to exercise (or benefit from) the right of first refusal he claims he held under the contract.

existence of any agreement when he stepped down from the RMD Presidency in 2010, even assuming (as the Court must on summary judgment) that Defendant made such representations.

IV.

In sum, the parties have extensively developed the record, yet Flinn cannot show with any convincing clarity that the source of his grievance is fraud rather than his own inability to raise the capital necessary to close the deal. Essentially, what Flinn complains of is his own failure to obtain a written, enforceable contract upon his resignation, and "against this the law cannot protect . . . ." *Kreate v. Miller*, 11 S.W.2d 99, 101 (Ky. 1928) (internal citation omitted).

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion for summary judgment (DN 101) is SUSTAINED and Plaintiff's second amended complaint (DN 53) is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Plaintiff's motion to strike Defendants' supplemental memorandum in support of summary judgment (DN 124) is DENIED as moot.

This is a final order.

cc: Counsel of Record